IN THE

# SUPREME COURT OF TENNESSEE,

FOR THE

# MIDDLE DIVISION,

NASHVILLE, . . . . . . . . . DECEMBER TERM, 1885.

## WILLIAM SPENCE *v.* THE STATE.

1. CRIMINAL LAW. *Juror. Competency.* A juror is not rendered incompetent to sit on the trial of an indictment for murder, by having heard or read in a newspaper that the defendant had killed the deceased about a settlement.

2. SAME. *Same. Newspaper statements.* Newspaper statements in a criminal offense, to disqualify a juror who has read them, must be such as fall within the disqualifying sources of information; any other statement amounting only to rumor, which would not disqualify.

3. SAME. *Same. Same.* A juror is competent in a trial for murder who states that he has an opinion formed from reading the newspapers and from talk in the neighborhood, which it would require evidence to remove; that he had heard that the defendant had killed the deceased about a settlement, and that was all·that he had heard or read; that if taken on the jury he would try the case on the evidence as sworn to by witnesses, and not on what he had read or heard, and would do fair and impartial justice between the State and the defendant.

4. SAME. *Same. Loose impressions.* Loose impressions or conversations of a juror as to the guilt or innocence of the prisoner, founded upon rumor, would not, if disclosed by him or others to the court when the jury is selected, have the effect to render him incompetent, and, *a fortiori,* if disclosed after verdict, would not be a cause of new trial, a much stronger case being required after than before trial.

(539)

5. SAME. *Motion for new trial.* When a witness, on a motion for a new trial, testified that a juror, after he had been summoned, said to him that " they ought to have hung him (the prisoner) at first and saved us the trouble," and that a person named also heard the conversation, and this person and the juror both testified that no such remark was. made, and the trial judge overruled the motion, there is no ground for reversal by this court.

6. SAME. *Defense of insanity.* On a trial for murder, in which the defense was insanity, and there was proof that the prisoner was in the habit of using intoxicating liquors in large quantities, often to excess, but no proof that he was laboring under *mania-a-potu* at the time of the killing, the charge being full upon the subject of insanity from any cause, and of the effect of intoxicating liquors on the grade of homicide, it is not error to refuse the following special request: " If the jury believe from the evidence that the defendant, at the time of killing, was insane, or was laboring under the disease of *mania-a-potu*, produced by the use of intoxicating liquors, then he should be acquitted."

7. SAME. *Same. Burden of proof.* The jury having found that the defendant was not insane, and the trial judge having refused a new trial, the burden is upon the defendant in this court to show that there is a preponderance of evidence in favor of the defense.

8. SAME. *Same. Evidence.* Isolated incidents, scattered through several years, introduced to show insanity, which might be attributed to the excessive use of liquors, and more continuous acts not necessarily signs of insanity, amount to little where the defendant up to the day of homicide transacted business, traded and was traded with, and mixed in social intercourse with his neighbors and the community as a sane man, many of his friends of daily intercourse testifying that the idea of his insanity never crossed their minds.

FROM DAVIDSON.

Appeal in error from the Criminal Court of Davidson county. MATT. W. ALLEN, J.

PALMER & PALMER, WRIGHT & BULLOCK and E. R. THURMAN for Spence.

ATTORNEY-GENERAL LEA and R. F. JACKSON for the State.

COOPER, J., delivered the opinion of the court.

The prisoner has appealed in error from a judgment of conviction of murder in the first degree.

William Spence, the prisoner, was for several years Marshal of the United States for the Middle District of Tennessee. He was succeeded in the office by his son-in-law, Edward S. Wheat. On March 11, 1884, Spence killed Wheat, between eight and nine o'clock in the morning, by shooting him with a pistol, at the crossing of College and Church streets, two of the most public streets in the city of Nashville. At this time, and for several years immediately preceding, Spence was, and had been living a few miles from the city, and supporting himself and family by bringing vegetables and milk to market. Wheat was the member of a firm having a business house on the corner of Church and Market streets, and resided on High street, a short distance north of Church street. The direct route from Wheat's residence to his place of business was from High to Church street, thence along Church street east, crossing Summer, Cherry and College streets, to Market street. There is proof that two or three weeks before the killing Spence called at the business house of Wheat's firm, and went up to a room in the second story where Wheat then was. After the customary greeting, defendant said to Wheat he wanted a settlement, repeating the words twice. Wheat replied, he would give him a settlement, but would not give him any more money, adding "you have been a trouble to me and

my family for a long time." Defendant said: "It did not come out of your pocket." Wheat replied: "It did." Both at this point seemed, according to the witness who details the interview, to be angry. Defendant then said: "It did not," adding some words which the witness did not hear. Wheat replied: "You are a liar," and took defendant by the collar, and drew him towards himself with one hand, and pointing with the other in his face, said: "You are an old man, and your age and gray hairs · are all that save you; get out as quick as you can." Defendant then went out, saying something which the witness did not hear. After this interview there is proof that from eight to twelve days before the killing, the defendant applied to three different persons at different times to borrow a pistol. To one of these persons, who asked him what he wanted with a pistol, he replied: "I have a settlement to make, and may need one." The defendant spent the night before the killing at a hotel on Church street, near High street, being the only time he had ever staid there, and on the next morning was observed to occupy a position in the office of the hotel from which he could have a view of Church street. And he also suddenly left a witness with whom he was talking, as if he had seen something which called him away. About that time Wheat came from High street, and crossed 'over to the south side of Church street, walking along that street towards his business house. He stopped for a few minutes at a cigar store, and while in the store there is proof tending

to show that defendant was watching him from the opposite side of the street. When he came out, and proceeded in the direction of his business house, the defendant crossed over to the same side of the street, and followed him in a faster walk. The defendant called to Wheat twice, and at the second call Wheat looked over his shoulder as if he recognized defendant, and went on without saying any thing that the witnesses heard. Defendant followed at a quicker pace, and, as Wheat was crossing College street, came within five feet of him, and shot him in the back. Wheat sank on his knees, and fell backwards, partly supported by his right elbow. Defendant moved around in front of Wheat, and remarked: "You choked me, did you? you'll never choke me again," and immediately fired another shot into his breast. Either shot would have been fatal, the fallen man dying in a few seconds. To the question by a friend, who was one of the first persons who came up, defendant said it was his son-in-law, Ed. Wheat, whom he had killed, using an oath and a vituperative epithet in regard to him, and added: "I tried to get a settlement from him, and he choked me." He repeated the same explanation to other witnesses. Defendant also said to his friend: "He is dead, and if he is not dead, I will shoot him again."

It is not denied that these facts, which the jury may well have found, make out a clear case of murder in the first degree.

The first error relied on for reversal is in the action of the court in pronouncing W. J. Taylor a

competent juror. After the defendant had exhausted
all his challenges, Taylor was presented as a juror.
He stated on his *voir dire* that he had an opinion
formed from reading the newspapers, and from talk
in the neighborhood; that it would require evidence
to remove this opinion; he had heard Spence had
killed Wheat about a settlement, and that was all he
had heard or read; did not know either of them;
that if taken on the jury he would try the case on
the evidence as sworn to by the witnesses, and would
not try the case on what he had read or heard, and
could do fair and impartial justice between the State
and the defendant; that he did not remember hav-
ing read the testimony given before the coroner's jury.

In *Conatser* v. *State* 12 Lea, 436, we had occasion
to review the decisions of this court upon the com-
petency of jurors in criminal cases, and to ascertain
the general principles which might be considered as
settled thereby. We found that the question whether
the nature and strength of a juror's opinion are such
as in law necessarily raises the presumption of par-
tiality, is one of mixed law and fact, to be tried, as
far as the facts are concerned, like any other issue
of that character, upon the evidence, and that the
finding of the trial court, before whom the juror gave
his testimony in person, would not be set aside by
the reviewing court except for manifest error. The
burden is upon the challenger to show the actual
existence of a disqualifying opinion. We held that
if the opinion of the juror go only to the fact that
a person has been killed, and that the defendant killed

him with a particular instrument, in a case where these facts could not be disputed, he would not necessarily have a disqualifying opinion. We also held that if the opinion of a juror be clearly such as disqualifies him, no inquiry is permissible whether, notwithstanding his opinion, he will be governed by the evidence alone, but that it is otherwise when the opinion is not based upon evidence or information that disqualifies. And that the law does not regard what the juror may call an opinion as an opinion at all, unless based upon knowledge or reliable information of facts, and the state of the mind of the juror in such case as to what weight he would give to the evidence to be introduced becomes an important element in ascertaining his competency. As a result we held that a juror was competent in the particular case who had heard persons say that the prisoner had killed the deceased with a hoe at a road-working, who did not know whether these persons were witnesses or not, nor whether they had heard the evidence or not; who had the same opinion still, which was a fixed opinion from rumor, and that it would take evidence favorable to the prisoner to remove it, but that he could disregard that opinion, and be governed in his verdict by the evidence.

In the case before us, it is conceded that if the juror had merely said that he heard that the defendant had killed Wheat, he would upon the statements on his *voire dire,* have come within the rulings of the *Conatser* case. But it is argued that the additional statement that the killing was "about a settle-

ment" took the case out of the rule. The fact that
the juror had heard that the defendant had killed
the deceased with a particular instrument, if undis-
puted, is, as we have held, immaterial. And it is
difficult to see how the additional fact of the cause
of the killing, if equally undisputed, could change the
result. For the cause would not ordinarily fix the
blame on either party, or show the nature of the
offense. That is certainly so in the present case.
And the testimony, as we have seen, is that the de-
fendant himself at the time, and always, said that the
difficulty originated in his wanting to get a settle-
ment from the deceased. But the answer to the
argument is that what the witness had heard and read
was mere rumor. He had not read the testimony
given before the coroner's jury, nor so far as appears
any detailed statement. What he had read and heard
was merely that defendant had killed deceased about
a settlement, facts about which there was no dispute.
Newspaper statements, to disqualify a juror, must be
such as fall within the disqualifying sources of in-
formation, and purport to be detailed by those who
professed to know the facts. Any other statement
would only amount to rumor, and it can only be
rumor, whether in parol or printed. If the opinion
of the juror was founded on rumor alone, then the
case falls exactly within the ruling of *Conatser* v.
*State.*

Upon the motion for a new trial, the affidavit of
one Davidson was offered to prove that on the day
on which the criminal court met, and the defendant's

·case was set for trial, the affiant had a conversation with W. J. Stringfellow, one of the jurors who tried the case.   Stringfellow and one Garland, · who were both summoned as jurors in the defendant's case, had stopped on their way to the city at a blacksmith shop to have a horse shod.   Davidson says that he had a conversation with Stringfellow while at the blacksmith shop, in which affiant said .to Stringfellow that it was a very bad time for a farmer to be summoned to serve on a jury, and Stringfellow replied ; ·" They ought to have hung him at first and saved us the trouble."   Upon his examination in open court Davidson repeated . the conversation, and stated further, ·" that Lee Garland was with said · Stringfellow, and heard all the conversation."   Stringfellow and Garland both positively denied that Stringfellow made any such remark to Davidson.

The general rule is, as we have seen above, that loose impressions and conversations of a juror as to the guilt or innocence of the prisoner, founded upon rumor, would not, if disclosed by him or others to the court when the jury is selected, have the effect to render him incompetent; and, *a fortiori*, if disclosed after verdict, would not be a cause for a new trial: *Howerton* v. *State,* Meigs, 262.   The fact that the juror was selected raises a presumption of competency, to overthrow which a clear case must be made out.   Having been selected by the defendant himself, a stronger case must be shown against him after trial than would have been necessary to set him aside before selection: *Mann* v. *State,* 3 Head, 373.

Great weight must, moreover, be given to the ruling of the trial judge, for the same reason that the like weight is given to his rulings on the competency of a juror when the jury was selected, for he has the witnesses before him, sees their manner and mode of expression, and is better prepared to weigh their testimony than we who see it only on paper: *Johnson* v. *State*, 11 Lea, 47. The juror himself is, moreover, a competent witness to deny or explain the charge against him: *Rader* v. *State*, 5 Lea, 610. The juror and his companion, who, as Davidson admits, was present, and heard his conversation with the juror, having both denied the charge, and the trial judge having found against the charge, there is clearly no error in the ruling complained of.

After the trial judge had delivered his charge to the jury, the defendant's counsel requested him to make the following additional charge: "If the jury believe from the evidence that the defendant, at the time of the killing, was insane, or was laboring under the disease of *mania-a-potu*, produced by the use of intoxicating liquors, then he should be acquitted." The judge declined the request upon the ground that it had already been substantially charged. And it is conceded that the charge is full upon the subject of insanity arising from any cause. It is also full upon the effect of the use of intoxicating liquors upon the grade of a homicidal offense, as settled by our decisions. It is conceded that in view of the judge's charge on the subject of insanity, "possibly nothing else might be necessary." But it seems to be thought

that because of the charge upon the effect of the use of .intoxicating liquors, which it was plainly the judge's duty to give, he ought to have said something about *mania-a-potu*, because *mania-a-potu* was mentioned by the medical witnesses.    But if there had been insanity from that cause, the charge did include it, and if there was no insanity the charge was correct on the subject of the use of intoxicating liquors.    And besides, there was not a particle of proof to show that the defendant was, at the time of the killing, laboring under any such disease.

The defense relied on below on the merits, and again insisted upon in this court, was that of insanity. The jury having found that the defendant was not insane, and the trial judge having refused a new trial, the burden is upon the defendant in this court to show that there is a preponderance of evidence in favor of the defense.    We regret to say that, upon full argument and a careful examination of the testimony, the preponderance is the other way.    Up to the day of the killing, the defendant transacted business, traded and was traded with, and mixed in social intercourse with his neighbors and the community, as a sane man.    Many of his friends who had known him for many years, and met him frequently, say that the idea of his being insane never crossed their minds. For several years the defendant had been given to the use of intoxicating beverages in large quantities, often to excess.    When drunk, to use the language of the witnesses, he would act like other drunken men. Nearly all the incidents relied on to show insanity,

being isolated instances scattered through several years, may be attributed to the temporary folly produced by excessive drink. And all of the more continuous acts, such as talking and laughing to himself, absent-mindedness, and insomnia, the physicians agree, are not necessarily signs of insanity. .The leading physician introduced by the defendant testifies that he often talks to himself. The hypothetical case put to the medical witnesses, made up of the isolated incidents above mentioned, grouped together without any of the testimony on the other side, amounts to nothing. The best evidence of which is that two of the three physicians to whom the case is put, from their own knowledge testify, that the defendant, in their opinion, was not insane.

There is no error in the judgment, and it must be affirmed.

The prisoner is an old man, whose three-score years and ten will be completed next month. The record shows that during this long life, up to the commission of the offense for which he stands convicted, he was a good citizen, of unblemished characacter, remarkable for his kindly and peaceable disposition. He was for years a man in active business, a merchant and banker, and in easy circumstances. Of late years he has been reduced to poverty, supporting himself and family by conducting a market garden. No doubt age and unusual and exacting labor have weakened his naturally strong mental faculties. Under these circumstances, and in view, especially of his age and character shown by the record, we think this is a

proper case to make, and do hereby make a certificate
to the Governor of the State, under the Code, sec-
tion 5259, which will be entered on the minutes of
the court, that in our opinion there are extenuating
circumstances attending the case, and that the punish-
ment ought to be commuted.

Judgment affirmed.